1  Steven Sklaver (237612)
   ssklaver@susmangodfrey.com
2  SUSMAN GODFREY L.L.P.
   1900 Avenue of the Stars, 14th Floor
3  Los Angeles, CA 90067
   Telephone: (310) 789-3100
4  Facsimile: (310) 789-3150

5  Seth Ard (*pro hac vice*)
   Ryan C. Kirkpatrick (243824)
6  SUSMAN GODFREY L.L.P.
   1301 Avenue of the Americas, 32nd Floor
7  New York, NY 10019
   Tel.:  212-336-8330
8  Fax:   212-336-8340
   sard@susmangodfrey.com
9  rkirkpatrick@susmangodfrey.com

10 Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| LSIMC, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 2:20-cv-11518<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR (1) BREACH OF CONTRACT AND (2) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff, and on behalf of itself and all others similarly situated, for its Complaint against America General Life Insurance Company, states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly-situated owners of life insurance policies issued by American General Life Insurance Company ("AmGen") in the State of California. AmGen has cheated Plaintiff and other owners of policies issued in California out of tens of millions of dollars by deliberately under-paying interest owed on amounts deposited with AmGen in violation of the terms of their standardized form contracts.

2. The California life insurance policies at issue include universal life insurance, which combines a savings component and an insurance component. The savings component is referred to as the policies' account (or accumulation) value, and policyholders earn interest on amounts held in those accounts. That rate of interest is called the "current interest rate" or "credited rate." The amounts in the account, plus accrued interest, are then used to pay for the insurance component through cost of insurance ("COI") and other charges. The amounts in the accounts can also be withdrawn through loans or the surrendering of a policy and converted into cash for the policyholder.

3. As the name implies, current interest rates are not fixed at issuance, and instead are redetermined, either quarterly or annually, based on the rates of interest that the insurer expects to earn by investing those funds (the "earned rate"), subject to a guaranteed minimum rate set forth in the policies. The AmGen policies at issue in this case all expressly state that, unlike COI rates and other charges, "[a]ny redetermination of interest rates will be based *only* on expectations of future investment earnings":

> Any redetermination of the cost of insurance rates, Premium Expense Charge Percentage or Monthly Administration Fee will be based on our future expectations as to mortality, persistency, expenses, reinsurance costs, and state and federal taxes. ***Any***

1

CLASS ACTION COMPLAINT

> ***redetermination of interest rates will be based only on expectations of future investment earnings.*** We will not change these rates or charges in order to recoup any prior losses.

4. AmGen has breached the terms of the policies by redetermining credited rates based on factors other than its expectations of future investment earnings. For at least the past four years, AmGen has redetermined the credited interest rates on Plaintiff's policy at 3.0%—which is the guaranteed minimum set forth in the policy—despite changes in AmGen's expectations of future investment earnings amidst dramatic fluctuations in the Treasuries, bonds, equities, and other assets in which AmGen invests policyholder account value. As discussed below, this is part of a deliberate strategy by AmGen to turn credited rates into a profit center and thereby increase shareholder returns at the expense of AmGen's contractual obligations to owners of policies issued in California.

5. Life insurers like AmGen enjoy a long-term capital advantage in their investment position which allows them to pursue investment strategies that earn higher investment returns than investors who are restricted to short term investments. A life insurance company's long-term capital comes from the long-dated nature of the life insurance products they sell. This allows AmGen to invest life insurance deposits in long-duration securities such as corporate debt, commercial and residential mortgage-backed securities, loan-backed and structured securities and mortgage loans, which earn significantly higher interest rates than United States treasury bonds. Insurers of AmGen's size have, for the past several years, typically projected and earned returns between 5 and 6.5%.

6. According to the 2019 Annual Report of AIG, AmGen's parent company, it "actively manage[s] the credited rates used for new and in-force business" in order to maximize the spread between credited rates and earned rates, and, as a result of this strategy, AIG brags that it is crediting the guaranteed minimum on ***63%*** of its universal life policies:

> **Reinvestment and Spread Management**
> We actively monitor fixed income markets, including the level of interest rates, credit spreads and the shape of the yield curve. ***We also frequently review our interest rate assumptions and actively manage the crediting rates used for new and in-force business***....
>
> \*\*\*
>
> For investment-oriented products in our [] Life Insurance and Institutional Markets businesses...[r]enewal crediting rate management is done under contractual provisions that were designed to allow crediting rates to be reset at pre-established intervals in accordance with state and federal laws and subject to minimum crediting rate guarantees. We will continue to adjust crediting rates on in-force business to mitigate the pressure on spreads from declining base yields, but our ability to lower crediting rates may be limited by the competitive environment, contractual minimum crediting rates, and provisions that allow rates to be reset only at pre-established intervals. As interest rates rise, we may need to raise crediting rates on in-force business for competitive and other reasons potentially reducing the impact of investing in a higher interest rate environment.
>
> \*\*\*
>
> ...In the core universal life business in our Life Insurance business, ***63 percent of the account values were crediting at the contractual minimum guaranteed interest rate at December 31, 2019***.

No mention is made in AIG's Annual Report of the contractual requirement that credited rates be based "only on [AmGen's] expectations of future investment earnings."

7. During the same period of time that AmGen has been redetermining "new money" credited rates on Plaintiff's policy at the guaranteed minimum rate of 3%, it is crediting interest *above* the guaranteed minimums on other policies with 3% guaranteed minimums, and even policies with guaranteed minimums in excess of 4%:

3
CLASS ACTION COMPLAINT

The following table presents fixed annuity and universal life account values of our Individual Retirement, Group Retirement and Life Insurance operating segments by contractual minimum guaranteed interest rate and current crediting rates:

| December 31, 2019<br>Contractual Minimum Guaranteed Interest Rate<br>(in millions) | At Contractual Minimum Guarantee | Current Crediting Rates | | Total |
|---|---|---|---|---|
| | | 1-50 Basis Points Above Minimum Guarantee | More than 50 Basis Points Above Minimum Guarantee | |
| **Individual Retirement** | | | | |
| <=1% | $ 5,835 | $ 2,756 | $ 19,812 | $ 28,403 |
| > 1% - 2% | 5,437 | 90 | 1,892 | 7,419 |
| > 2% - 3% | 11,668 | 237 | 69 | 11,974 |
| > 3% - 4% | 9,094 | 41 | 6 | 9,141 |
| > 4% - 5% | 517 | - | 4 | 521 |
| > 5% - 5.5% | 34 | - | 5 | 39 |
| Total Individual Retirement | $ 32,585 | $ 3,124 | $ 21,788 | $ 57,497 |
| **Group Retirement** | | | | |
| 1% | $ 1,504 | $ 2,514 | $ 4,540 | $ 8,558 |
| > 1% - 2% | 5,329 | 932 | 552 | 6,813 |
| > 2% - 3% | 14,703 | 4 | - | 14,707 |
| > 3% - 4% | 788 | - | - | 788 |
| > 4% - 5% | 7,028 | - | - | 7,028 |
| > 5% - 5.5% | 169 | - | - | 169 |
| Total Group Retirement | $ 29,521 | $ 3,450 | $ 5,092 | $ 38,063 |
| **Universal life insurance** | | | | |
| 1% | $ - | $ - | $ - | - |
| > 1% - 2% | 94 | 24 | 373 | 491 |
| > 2% - 3% | 270 | 584 | 1,068 | 1,922 |
| > 3% - 4% | 1,460 | 483 | 68 | 2,011 |
| > 4% - 5% | 2,881 | 231 | 38 | 3,150 |
| > 5% - 5.5% | 200 | - | - | 200 |
| Total universal life insurance | $ 4,905 | $ 1,322 | $ 1,547 | $ 7,774 |
| **Total** | $ 67,011 | $ 7,896 | $ 28,427 | $ 103,334 |
| Percentage of total | 65 % | 8 % | 27 % | 100 % |

This discrepancy cannot be explained if AmGen is redetermining rates solely based on its expectations of future investment earnings.

8.   Simply put, AmGen is now ignoring the very clear contractual language and instead redetermining credited rates based on its shareholder-driven profit targets and the "competitive environment." Because neither profit targets nor "competitive environment" goals are expectations of investment earnings, AmGen has breached, and is breaching, the terms of these standardized form contracts issued in California. Plaintiff, on behalf of itself and similarly-situated owners of policies issued in California, seeks damages and other relief for under-payment of interest.

## THE PARTIES

9.   Plaintiff LSIMC, LLC is a Delaware limited liability company, whose only member is Cook Street Master Trust III, a New York common law trust.

LSIMC, LLC owns universal life policy number UM0066177L, which was issued by AmGen on February 20, 2010 (the "LSIMC Policy").

10. The LSIMC policy was issued in the State of California and states on its face "THIS IS A CALIFORNIA POLICY."

11. Defendant American General Life Insurance Company is a corporation organized and existing under the laws of Texas and has its principal place of business in Houston, Texas and is licensed to and does transact insurance in California.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one putative class member and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13. This Court has personal jurisdiction over AmGen because it regularly transacts business and issues life insurance in the State of California and the policies at issue in this case were all issued in California.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events giving rise to Plaintiff's cause of action occurred in this District. Plaintiff's policy was issued in Los Angeles County.

## FACTUAL BACKGROUND

### A. The California Policies at Issue

15. The policies at issue include flexible-premium, universal and variable universal life policies issued by AmGen or its predecessors-in-interest in the State of California (the "California Policies"). They were all issued on standardized policy forms and insureds are not permitted to negotiate different terms.

16. Universal life policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value," and

referred to in the AmGen policies as the "Accumulation Value."[1] There are no fixed monthly premium payments on universal life policies. Rather, the policyholder pays into the account value, and then monthly charges, such as cost of insurance charges, are deducted therefrom. So long as the cash surrender value is sufficient to pay the COI and other charges, the policy will remain in force.

17. Excess amounts in the account value earn interest at the credited rate, referred to in the California Policies as the "current interest rate." This interest helps fund future policy charges, and reduces the amount of premiums that the policyholder will have to pay in the future. Often policyholders will fund large amounts in early years, and then rely upon accumulated interest to pay COI and other charges in later years without the need to continue paying premiums.

18. Credited rates are reviewed and redetermined at least annually, if not quarterly, and are supposed to reflect the then-current rate of return that the insurer projects to earn, subject to a guaranteed minimum credited rate set forth in each policy. The guaranteed minimum credited rates are typically much lower than the credited rates that were declared when the policies were issued. For Plaintiff's policy, the guaranteed minimum credited rate is 3.00%.

19. Many of AmGen's policies were also issued with "current interest bonuses," also referred to as "persistency bonuses." A current interest bonus is an additional rate of interest by which the current interest rate is increased after a policy has been in force for a certain length of time, typically 5 or 10 years. For many AmGen policies, the current interest bonus applies only if AmGen's declared annual interest rate at the end of each month is greater than the guaranteed minimum rate. So when AmGen redetermines credited rates at guaranteed minimums, it avoids the obligation to pay persistency bonuses.

20. Plaintiff's policy has a persistency bonus provision, which is as follows:

---

[1] The policies also use the term "cash value," which is defined as the Accumulation Value less surrender charges. "Cash surrender value" is defined in the policies as cash value less indebtedness. This is the net amount a policyholder would receive if he or she were to surrender a policy.

> At the end of the first month following the fifth policy anniversary, and at the end of each month thereafter, this policy will be eligible for a current interest bonus. The bonus will be credited monthly to the Accumulation Value subject to the following guidelines:
>
> The declared annual interest rate at the end of each month must be greater than the guaranteed annual interest rate [of 3%]; and
>
> The bonus credited each month will increase the declared annual interest rate applied to the Accumulation Value not offset by a policy loan by .25% (one quarter of one percent).

21. Plaintiff's policy also has language concerning what can and will be considered in redetermining current interest rates. While the policy sets forth a number of factors that may be considered in setting COI rates and other charges, the policy makes clear that only one thing can be considered in setting credited rates—AmGen's expectations of future investment earnings:

> Any redetermination of the cost of insurance rates, Premium Expense Charge Percentage or Monthly Administration Fee will be based on our future expectations as to mortality, persistency, expenses, reinsurance costs, and state and federal taxes. ***Any redetermination of interest rates will be* based *only on expectations of future investment earnings.*** We will not change these rates or charges in order to recoup any prior losses.

22. By making clear that nothing else can be considered in setting credited rates, this language means that (a) credited rates should be based on AmGen's expectations of its future investment returns and (b) profit objectives and the "competitive environment" (or lack thereof) cannot be considered in any redetermination.

23. AmGen imposes other charges through which it recovers all of its costs and earns a profit. The COI charge compensates AmGen for its cost of providing insurance coverage and paying death benefits when due; the Monthly Administration Fee pays for AmGen's administration costs; and AmGen collects a premium charge of 6.5% to 7.5% of all premiums paid—which largely represents profit to AmGen.

24.     AmGen also imposes surrender charges when policyholders seek to cancel their policies and withdraw their account value. And AmGen collects interest when policyholders take policy loans from their account value. Notably, the rate of interest charged by AmGen for policy loans is much higher than the "current interest rate" that AmGen credits. For the LSIMC Policy, the current Loan Interest Rate is 3.850%, compared to a current credited rate of 3.000%.

25.     AmGen's practice of deliberately depressing current interest rates has a compounding negative effect. With less accrued interest from which to pay COI and other charges, policyholders have to pay more premiums into their accounts. AmGen then deducts from each of those premium payments a 6.5-7.5% premium charge as profit. So, the less interest that accrues, the more premium charges AmGen collects, and the higher AmGen's profit margins.

26.     This conduct also serves a larger purpose: the inducement of lapses and surrenders. Insurers like AmGen have designed universal life products to earn substantial profits in early years and to lose money in later years. *See* Daniel Gottlieb and Kent Smetters, Lapse-Based Insurance (2016), The Wharton School.[2]  When a policyholder lapses or surrenders a policy, AmGen retains all the COI charges, premium charges, and other fees previously paid, and avoids both (a) later year losses and (b) ever paying death benefits. In the case of surrenders, AmGen also collects a surrender charge.

27.     The California policies at issue in this case have generally been in force for between ten and twenty years. By crediting less interest than required, AmGen is forcing policyholders to pay more and more money to keep their policies in force. This has the direct and intended effect of causing policyholders to lapse or surrender their policies, resulting in even more profit for AmGen and its shareholders.

---

[2]  Available at https://faculty.wharton.upenn.edu/wp-content/uploads/2016/11/Insurance41.pdf (last visited November 11, 2020).

28.     AmGen thus (unlawfully) makes money in at least four ways by crediting artificially low interest rates: (i) it retains the difference between its earned rate and the credited rate, a delta of approximately 3% on Plaintiff's policy if AmGen's earned rate is similar to competitors, (ii) it can avoid the payment of the persistency bonuses that it agreed to pay policyholders,[3] (iii) it increases the premium charges collected, and (iv) it induces lapses and surrenders.

29.     AmGen has issued other universal life policies that allow it to consider additional factors in setting credited rates. For example, AmGen has issued policies with the following language, which omits the "based only on expectations of investment earnings" language and groups interest rates in with other policy charges:

> Any redetermination of the cost of insurance rates, ***interest rates***, expense charges, net premium percentage or monthly administration fee, will be based on our expectations as to ***investment earnings, mortality, persistency, expenses, reinsurance costs, and state and federal taxes***. We will not change these charges in order to recoup any prior losses.

30.     This is what is known as a Multi-Factor Credited Rate Provision, as it allows the insurer to base credited rates on factors other than future investment earnings. The policies at issue in this case all contain Single-Factor Credited Rate provisions: no factor other than expectations of future investment earnings may be considered.

---

[3] Despite paying only guaranteed minimum interest rates on new premiums, recent annual reports provided by AmGen to Plaintiff state that current interest bonuses are being paid. But these annual reports also state that "Interest credited to the accumulation value is based on the annual rate of interest in effect when a payment is received. The guaranteed minimum rate, as well as the interest rate currently credited to the new premium payments, can be found on page 1 of this statement. Rates applicable to prior premium payments will vary." Because AmGen credits different rates depending on the time the premiums were received, it is not clear whether AmGen is paying current interest bonuses on all of Plaintiff's account value, or only portions of it. AmGen's lack of transparency concerning what rates are being applied to which amounts, and how that is determined, hides from policyholders how the policy is being administered.

**B.     AmGen's Unlawful Failure to Redetermine Credited Rates Based Solely on Expectations as to Future Investment Earnings**

31.     Insurers like AmGen review and systematically quantify anew their "expectations as to future investment earnings" at least each year, if not every quarter. As AIG explains in its 2019 Annual Report: "We actively monitor fixed income markets, including the level of interest rates, credit spreads and the shape of the yield curve."

32.     At the end of each year, if not each quarter, AmGen adopts a new earned rate assumption. That different earned rate assumption is documented in actuarial memoranda, best estimate assumption approval memoranda, and is then used in AmGen's own financial projections.

33.     For universal life, AmGen invests policyholder accounts into fixed income strategies, using sophisticated investment techniques and hedging to maximize returns. Returns are generally much higher than Treasury Rates, but with less volatility than the stock market. Regardless of what benchmark one uses, there has been substantial fluctuation in markets over the past four years. The S&P 500 Index has increased from 2,000 to over 3,700. Treasury rates increased from under 1.5% in 2016 to over 3% in 2018. But, as discussed below, AmGen continues to declare with each redetermination the same, guaranteed minimum rates on Plaintiff's policy.

34.     With billions of dollars to invest and sophisticated investment strategies, most insurers of AmGen's size have projected earned rates between 5.0% and 6.5% over the past four years, notwithstanding the generally low-interest environment that has persisted since 2008.

35.     At the same time that AmGen is reviewing its expectations of future investment earnings, it is also reviewing and redetermining credited rates. As AmGen explains in its 2019 Annual Report: "We also frequently review our interest rate assumptions and actively manage the crediting rates used for new and in-force

business." At least each year, a "new premium" credited rate is declared and reported to policyholders on their annual reports, as reflected in this annual report for the LSIMC Policy:

```
Policy Number: UM0066177L
Date of Issue: FEBRUARY 20, 2010
Issue Age: 73                    Sex:  FEMALE
Planned Periodic Premium: $3,714.86
Mode of Payment:  QUARTERLY
Loan Interest Rate:       3.850%
Crediting Interest Rate:
        New Premiums:     3.000%
        Guaranteed:       3.000%
```

36.  Credited rates also have to be reviewed for purposes of certifying illustrations and responding to interrogatories from the National Association of Insurance Commissioners.

37.  Unfortunately for policyholders, AmGen has had a singular goal when redetermining credited rates in recent years: to reduce them in order to bolster profits and maintain and increase the "spread" between credited rates and earned rates. As of December 31, 2019, AIG promoted to shareholders that it had reduced 63% of account values to the minimum guaranteed rate. The vast majority of these policies were issued by AmGen.

38.  Further, AIG's 2019 Annual Report provides a breakdown of the amount of account value in policies with different guaranteed minimum credited rates, and identifies how much in account value is being credited with interest above the minimum, in a graphic pictured above in paragraph 7.

39.  Plaintiff's policy is in the third row of that table under "universal life insurance" with guaranteed credited rates above 2% and up to 3%. That chart shows that Plaintiff and other policyholders with a collective $270 million in account value are being credited at guaranteed minimums of 3% or lower. Meanwhile, other

policyholders with $584 million in account value are being credited with between 1 and 50 basis points more interest, and $1.07 billion in account value is being credited more than 50 basis points above the minimum. Indeed, even $269 million in account value with guaranteed minimums in excess of 4% is being credited with additional current interest.

40. The only logical inference to draw from this is that AmGen is not redetermining credited rates based on expectations of future investment earnings, but rather, by block of business based on changing profit targets and the "competitive environment" applicable to different blocks. For all policies with the same rate redetermination language as Plaintiff, this is a breach of contract: AmGen's investment earning expectations are not its profits targets or competitive environment goals. And if AmGen's projected earned rate has been approximately 6%, then it has been under-crediting all of these policies, even those earning in excess of 4% current interest.

41. Upon information and belief, AmGen is also targeting policies with persistency bonuses for differential treatment. By keeping current interest rates on Plaintiff's policy at 3.00%, rather than anything more, AmGen avoids being required to pay the otherwise guaranteed persistency bonuses. This too is unlawful: under the express policy language, AmGen cannot determine its credited rates based on whether a policy has a persistency bonus. This conduct also violates California's implied covenant of good faith and fair dealing and California's Unfair Competition Law.

42. The nature of AmGen's conduct is such that Plaintiff and each member of the proposed class would be unaware that AmGen was engaging in wrongdoing, and AmGen has in fact affirmatively concealed its wrongdoing. Only AmGen possesses the internal earned rate projections on which current interest rates are supposed to be based, and AmGen does not disclose this information to policyholders. Nor does AmGen disclose the methodology by which it calculates

credited rates. Indeed, AmGen does not even disclose what rates are being applied to different portions of account value, which AmGen says "vary" depending on "when a payment is received." *See* Note 3 *supra.* Rather, AmGen merely sends annual reports each year showing a "crediting interest rate" for "new premiums". Without disclosure by AmGen of its projected earned rate each year, or the methodology through which credited rates are being calculated and applied, a reasonable policyholder, acting diligently, would have no way of knowing that he or she was being cheated. AmGen is therefore estopped from asserting a statute of limitations affirmative defense. AmGen's conduct in failing to disclose the true factors it was using to redetermine credited interest rates misled Plaintiff and prevented it from learning of the factual bases of these claims for relief. Plaintiff proceeded diligently to file suit once it discovered the need to proceed; Plaintiff was not at fault for failing to discover any breaches; and Plaintiff had no actual or presumptive knowledge of the breaches. Plaintiff did not suspect or learn of any breaches until October 2020, when the LSIMC policy was reviewed by counsel and actuarial experts. AmGen is aware that it has superior and in fact exclusive knowledge of its own expectations of future investment earnings, and has in fact used this disparity of knowledge to exploit and cheat policyholders.

## CLASS ACTION ALLEGATIONS

43. This action is brought by Plaintiff individually and on behalf of the "Investment Earnings Only California Class" pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

44. The Investment Earnings Only California Class consists of:

> All current and former owners of life insurance policies issued by American General Life Insurance Company, or its predecessors, in the State of California on policy forms that provide that any redetermination of interest rates will be based "only on expectations of future investment earnings."

13
CLASS ACTION COMPLAINT

45. Plaintiff reserves the right to seek certification of subclasses, or alternative classes, by original issuing company, product, guaranteed minimum credited rate, or dates of ownership (collectively, "Subclasses").

46. The Investment Earnings Only California Class and any Subclasses do not include defendant AmGen, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

47. The Investment Earnings Only California Class and Subclasses consist of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by AmGen.

48. The claims asserted by Plaintiff are typical of the claims of the Investment Earnings Only California Class and any Subclasses.

49. Plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of the classes.

50. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

51. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

52. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

    (a) the construction and interpretation of the form insurance policies at issue in this litigation;

    (b) whether AmGen's actions in redetermining credited rates based on impermissible factors, and failing to increase credited rates in line with AmGen's expected earned rate, violated the terms of the form contracts;

(c) whether AmGen based its current interest rates on factors other than expectations as to future investment earnings;

(d) whether AmGen's expectations as to future investment earnings are higher than the current interest rates credited to Plaintiff and members of the class;

(e) whether AmGen breached its contracts with Plaintiff and members of the class;

(f) whether Plaintiff and members of the proposed classes are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

53. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when AmGen's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and AmGen's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

54. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff, the Investment Earnings Only California Class, and any Subclasses.

55. The California Policies, including the LSIMC Policy, are binding and enforceable contracts.

56. AmGen breached these contracts by determining credited rates based on factors other than its expectations of future investment earnings.

57. AmGen breached these contracts by failing to increase credited rates as its expectations of future investment earnings improved.

58. The California Policies also contain an implied promise of good faith and fair dealing. This implied promise means that AmGen will not do anything to unfairly interfere with or frustrate the right of any other party to receive the benefits of the contract, or to otherwise take unfair advantage of policyholders or act in bad faith in the performance of duties.

59. AmGen breached the implied covenant of good faith and fair dealing by failing to increase credited rates when AmGen's earned rate expectations improved and by continually redetermining credited rates at contractual minimums in order to avoid payment of persistency bonuses. AmGen promised that it would pay persistency bonuses so long as the current interest rate was above the guaranteed contractual minimum. A reasonable policyholder would not expect AmGen to then manipulate the current interest rate—never increasing it even .01% over the course of four years, despite numerous market fluctuations—to avoid paying these bonuses. A reasonable policyholder would also not expect AmGen to make the policies more expensive for purposes of increasing amounts of premium charges collected and inducing lapses and surrenders.

60. AmGen's actions unfairly interfered with the Plaintiff's and the class's receipt of policy benefits and did not comport with policyholders' reasonable contractual expectations under the policies.

61. Plaintiff, the Investment Earnings Only California Class, and any Subclasses have performed all of their obligations under the policies, except to the extent that their obligations have been excused by AmGen's conduct as set forth herein.

62. As a direct and proximate cause of AmGen's material breaches of the policies, Plaintiff and the Investment Earnings Only California Class and any Subclasses have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial. To the extent that any policies have lapsed or been surrendered following AmGen's express breach or breach of the implied covenant of good faith and fair dealing, Plaintiff and the members of the Investment Earnings Only California Class are entitled to reinstatement.

### SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law – *Cal. Bus & Prof. Code § 17200, et seq.*

63. Plaintiff reallege and incorporate herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff, the Investment Earnings Only California Class, and any Subclasses.

64. AmGen committed acts of unfair competition by determining current interest rates using unauthorized factors in order to avoid the payment of persistency bonuses and to induce lapses and surrenders. When earned rates declined in the late 2000s, AmGen did not hesitate to reduce credited rates. But when earned rates subsequently increased, AmGen continually redetermined current interest rates at the contractual minimum. This "one-way street" approach to credited rates—reducing them when earned rates decline, but leaving them the same when earned rates

increase—is unethical, unscrupulous, and causes injury to consumers that outweigh any benefits, particularly given that the ultimate goal appears to be avoiding payment of persistency bonus and the inducement of lapses.

65. These unfair and unlawful practices are continuing in nature and are widespread practices in which Defendant engages.

66. Plaintiff therefore seek restitution and/or disgorgement against AmGen and an injunction ordering reinstatement of any policy that lapsed or was surrendered following AmGen's violation of Cal. Bus & Prof. Code § 17200, et seq.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Investment Earnings Only California Class (inclusive of any Subclasses) pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the class compensatory damages;

3. Awarding Plaintiff and the class restitution and/or disgorgement and such other equitable relief as the Court may deem proper, including without limitation, reinstatement and other equitable relief for policies that were lapsed or surrendered after AmGen's breach.

4. Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as attorney's fees and costs; and

5. Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated:  December 21, 2020

Respectfully submitted,

By: */s/ Steven G. Sklaver*_____
Steven G. Sklaver
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com

Seth Ard (*pro hac vice*)
Ryan C. Kirkpatrick
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Attorneys for LSIMC, LLC